### ARMOUR & CO. v. RENAKER et al.

(Circuit Court, E. D. Kentucky.    September 25, 1911.

1. COMPROMISE AND SETTLEMENT (§ 19*)—CORRECTING FOR MISTAKE—GROSS NEGLIGENCE—EQUITIES OF PARTIES.

   A compromise and settlement, made after extended negotiations between complainant and defendants, involving mutual accounts, many items of which were in dispute, and which has been fully executed, will

---

not be reopened by a court of equity to permit complainant to recover from defendants the amount of an item with which, through mistake, it omitted to charge defendants in its account, although such item was a proper charge, and complainant made the settlement in the mistaken belief that its account contained all items in its favor, where it does not appear whether or not defendants knew that complainant was acting under the mistake, but does appear that they probably would not have agreed to a settlement more favorable to complainant, and that under the evidence the one made was as favorable as complainant was equitably entitled to, and it is further shown that its mistake was due to gross negligence, and that it failed to correct it, although its attention was called to it before the settlement was consummated.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 71–75; Dec. Dig. § 19.*]

**2. EQUITY (§ 425*)—DENIAL OF RELIEF—EFFECT OF FALSE TESTIMONY BY DEFENDANT.**

The fact that the court is persuaded that defendants in an equity suit have testified falsely does not justify it in refusing to enter a decree in their favor where required by the other evidence in the case without considering any of their testimony.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 425.*]

In Equity. Suit by Armour & Co. against S. Renaker, Barry Renaker, and Leon Renaker. On final hearing. Decree for defendants.

Brown & Nuckols and T. L. Edelen, for plaintiff.
J. T. Simon, for defendants.

COCHRAN, District Judge. This cause is before me under submission for final decree. The plaintiff seeks to recover from the defendants the sum of $4,882.39 and interest from a date left blank in the bill. The facts out of which has grown its claim are these:

On November 8, 1905, the plaintiff was engaged, in part, in the business of buying turkeys in Kentucky, mainly, if not entirely, in the eastern part of the state, and reselling them in the eastern market, mainly in Boston, and the defendants were engaged in the business of buying turkeys at Cynthiana and Marshall, Ky., from the farmers, and selling them to dealers doing business in the eastern market. The defendant S. Renaker is the father of the defendants Barry Renaker and Leon Renaker, and they did business under the name of S. Renaker & Sons. Both Cynthiana and Marshall are stations on the Louisville & Nashville Railroad, the latter a small station in Mason county. The defendant S. Renaker was engaged in like business with one Heinrich, under the name of Renaker & Heinrich, at Mt. Sterling, Ky. There were possibly as many as a dozen or more other persons and firms engaged in like business at different points in the state, and there seems to have been some sort of an organization amongst them known as the Kentucky Poultry Dealers' Association. On that date, to wit, November 8, 1905, at Lexington, Ky., the plaintiff, Armour & Co., entered into a written contract with each of such persons and firms, including the defendants and the firm of Renaker & Heinrich, for the purchase at certain prices of all the turkeys which they might buy, own, or slaughter from that date until February 1, 1906. By

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the defendants' contract the turkeys covered by it were to be delivered "F. O. B. cars at Cynthiana and Marshall." And by the contract with Renaker & Heinrich they were to be so delivered at Mt. Sterling. The plaintiff in making these contracts was represented by one Hurlburt, the head of its poultry department. Amongst those who entered into such contracts was one Smith of Shelbyville, Ky. In addition to having a contract himself, he acted as a middleman between the plaintiff and the members of the association. He possibly organized the association and negotiated the terms of the sale to plaintiff. Afterwards in matters growing out of the execution of the contracts he acted indifferently on their behalf and on plaintiff's behalf, seemingly without compensation. In any difficulty that arose both parties looked to him for aid in its settlement. Under their contract defendants made nine shipments during the month of November before Thanksgiving and none other. At least these are the only shipments with which this case is concerned. Five of these shipments were made from Cynthiana and four from Marshall. The shipments were all made in refrigerator cars. Four of them were made in such cars of the Merchant's Despatch Transportation Line, known as the "M. D. T.," three in such cars of the plaintiff, its line being known as the "Armour Refrigerator Line," or the "A. R. L.," and two in such cars of the Pennsylvania Express. The date of each shipment, the number of the car, the line, place of shipment, the number of pounds shipped, and the amounts due defendants under the contract are as follows, to wit:

| Date. | No. | Line. | Station. | Pounds. | Price. |
|-------|-----|-------|----------|---------|--------|
| Nov. 13th. | 12989 | M. D. T. | Marshall | 33,084 | $ 6285.96 |
| Nov. 14th. | 11429 | M. D. T. | Cynthiana | 32,121 | 6102.99 |
| Nov. 17th. | 9927 | A. R. L. | Cynthiana | 27,812 | 5284.28 |
| Nov. 17th. | 9948 | M. D. T. | Marshall | 30,358 | 6015.52 |
| Nov. 20th. | 12303 | M. D. T. | Cynthiana | 20,462 | 3887.78 |
| Nov. 20th. | 8593 | A. R. L. | Marshall | 17,088 | 3381.72 |
| Nov. 22nd. | 5355 | A. R. L. | Cynthiana | 25,768 | 4895.92 |
| Nov. 24th. | 5947 | Pa. Ex. | Marshall | 16,793 | 3106.71 |
| Nov. 24th. | 5891 | Pa. Ex. | Cynthiana | 26,235 | 4853.47 |
| | | | Total | 229,721 | $43,814.35 |

It will be noted that of the shipments the first five except one were by M. D. T. cars, that one being by an A. R. L. car, and was on November 17th, nine days after the contract was made. It will be noted, further that the first four shipments were much heavier than the subsequent five. Their average was 30,843 pounds, whereas the average of the other five was 21,269 pounds. It will still further be noted that on November 17th, two shipments were made, one from Cynthiana and the other from Marshall, the former in an A. R. L. car and the latter in a M. D. T. car, and that on November 20th two shipments

wcre again made one from Cynthiana and the other from Marshall, the former this time a M. D. T. car and the latter an A. R. L. car.

The defendants drew against each shipment, the drafts against the Cynthiana shipments amounting to 80 per cent. of the invoice and those against the Marshall shipments covering the whole invoice except the first one, which was only 80 per cent. The drafts so made were all paid. The amounts paid were as follows, to wit:

| Draft. | | Car | | |
|--------|----------|-----|-------|-----------|
| "      | Nov. 13th. | Car | 12989 | $ 5028.76 |
| "      | Nov. 14th. | "   | 11429 | 4882.39   |
| "      | Nov. 17th. | "   | 9927  | 4227.42   |
| "      | Nov. 17th. | "   | 9948  | 6015.52   |
| "      | Nov. 20th. | "   | 12303 | 3110.22   |
| "      | Nov. 20th. | "   | 8593  | 3381.72   |
| "      | Nov. 22nd. | "   | 5355  | 3916.73   |
| "      | Nov. 24th. | "   | 5947  | 3106.71   |
| "      | Nov. 24th. | "   | 5891  | 3882.77   |

$37,552.24

The difference between the invoices and the drafts made against them was the sum of $6,262.10, and plaintiff at the close of their dealings owed defendants that sum of money if nothing else was to be taken into consideration; i. e., if plaintiff was to be charged the full amount of the invoices and credited with no more than the drafts paid. Four of these shipments, however, were rejected by plaintiff on their arrival in the eastern market because they were in bad condition. The turkeys had become "struck" with animal heat indicated by greenish streaks on their backs. They were not sufficiently "struck" as to be rendered unsalable. "Turkey sharks," as they are termed, buy them in that condition, cut off the backs, put them in salsoda, wash them out, and then sell them. Two of the shipments rejected were from Cynthiana and two from Marshall. They were the first two shipments, one on November 13th from Marshall in car No. 12989, and the other on November 14th from Cynthiana in car No. 11429, one of the next two shipments on November 17th, to wit, that from Marshall in car No. 9948, and one of the next two shipments on November 20th, to wit, that from Cynthiana in car No. 12303. They were all the shipments in M. D. T. cars. There were no rejections of the other five shipments in the A. R. L. or Express cars. The first shipment on November 13th in car No. 12989 from Marshall went to New York, and the other three went to Boston. Though these shipments were all rejected by plaintiff, they were all sold through agencies selected by it and the proceeds thereof received by it. The New York shipment was sold at Gonceberts market. The shipment on November 14th in car No. 11429 from Cynthiana was sold by Mentzer & Co., and the other two Boston shipments, to wit, that of November 17th in car No. 9948 from Marshall and that of November 20th in car No. 12303 from Cynthiana by Kimball & Co., an agency of plaintiff. The defendants consented to the disposition made of the car sold on Gonceberts market and by Mentzer & Co. of Boston. They did not consent to the other two cars being sold by Kimball & Co. of Boston. They requested that they be turned over to George A. Fales & Co., with

whom they had been doing business for many years for sale, but their request was refused. These four shipments when thus sold yielded the following sums, to wit:

| | | |
|---|---|---|
| Car No. 12989 | Sold in New York by Gonceberts Market.......... | $4,064.63 |
| Car No. 11429 | Sold in Boston by Mentzer & Co................. | 4,064.42 |
| Car No. 9948 | Sold in Boston by Kimball & Co................. | 1,187.14 |
| Car No. 12303 | Sold in Boston by Kimball & Co................. | 477.86 |

Making a total of...................................... $9,794.05

The total amount of the invoice for these four shipments was $22,-292.25, and deducting therefrom what they yielded, $9,794.05, leaves the sum of $12,498.20 as the loss thereon. The biggest portion of the loss was on the two shipments sold by Kimball & Co. The invoices of these two cars amounted to $9,903.60. Deducting what they yielded, $1,665, leaves a balance of $8,238.60, which was the loss on account of them alone.

After making these nine shipments as has been related, the matter of settling their affairs came up between plaintiff and defendants. At that time plaintiff claimed that it should be charged with no more on account of these four shipments than what it had received, or, in other words, that defendants should sustain the entire loss. It further claimed that, instead of being charged with $3,381.72, the amount of the invoice on A. R. L. car No. 8593 shipped from Marshall November 20th, being for 17,088 pounds at 17 cents and $135 for freight, it should only be charged with $3,017.34 which would be what 16,763 pounds would come to at 18 cents. It further claimed that defendants were accountable to it for $258.40 for the amount paid on a draft which they had made against it for freight on car No. 12989 from Marshall November 13th, which it is claimed it was not bound to pay because the car had been rejected. It further claimed to be entitled to deduct from what it was accountable to defendants the following four items, to wit: $190.04 on account of shrinkage in weight; $1,577.21, an abatement of 1 cent per pound for 157,721 pounds; $38.63 for icing the cars at point of shipment; and $12.74 for telegraph charges—amounting altogether to the sum of $1,818.62. If all these claims had been correct, the state of the account between plaintiff and defendants would have been as follows, to wit: The plaintiff would have been accountable to defendants for the following sums, to wit:

| | | |
|---|---|---|
| Car No. 12989 | Proceeds of sale................................ | $ 4,064 63 |
| Car No. 11429 | Proceeds of sale................................ | 4,064 42 |
| Car No. 9927 | Invoice ........................................ | 5,284 28 |
| Car No. 9948 | Proceeds of sale................................ | 1,187 14 |
| Car No. 12303 | Proceeds of sale................................ | 477 86 |
| Car No. 8593 | Invoice as plaintiff claimed it should be......... | 3,017 34 |
| Car No. 5355 | Invoice ........................................ | 4,895 92 |
| Car No. 5947 | Invoice ........................................ | 3,106 71 |
| Car No. 5891 | Invoice ........................................ | 4,853 48 |

Making a total of...................................... $30,951 78

The defendants would have been accountable for the following sums, to wit:

Amount received on the nine drafts made against the nine ship-
ments as above.......................................... $37,552 24
Amount paid on draft for freight on car No. 12989, rejected...... 258 40
Amount of the four items which plaintiff claimed right to deduct 1,818 62

　　Makes a total........................................ $39,629 26
Deducting therefrom the amount for which plaintiff was account-
able to defendants........................................ 30,951 78

　　Leaves a balance of.................................... $ 8,677 48

—which would be due plaintiff from defendants on this basis, instead
of a balance of $6,262.10 due defendants from plaintiff if settlement
was to be had by charging plaintiff with the invoices of the nine ship-
ments, and crediting the plaintiff with the amounts paid on the drafts
made against them. The difference between the two ways of stating
the accounts is $14,939.59. This difference is made up as follows:

Loss on the four cars rejected by plaintiff..................... $12,498 20
Difference of invoice of car No. 8593 between what defendants
　made it out and what plaintiff claimed it to be............... 364 38
Draft for freight on car No. 12989............................ 258 40
Amount of four items which plaintiff claimed should be deducted 1,818 62

　　Total ..................................................... $14,939 60

　　But, though the balance due plaintiff from defendants would have
been $8,677.49 if its claims as to the several matters indicated had been
sound, plaintiff did not, when they came to settle, claim that defendant
owed it that sum. It only claimed that they owed it the sum of $3,-
795.10 or $4,882.39 less than what on that basis would have been due
it. The way in which it came about that it so claimed was this: The
draft against the second shipment, to wit, that made on November
14th, from Cynthiana in car No. 11429, and which was paid, amounted
to $4,882.39. The invoice of that shipment amounted to $6,102.99,
and the draft was for 80 per cent. thereof. The shipment when it
reached Boston, as has been stated, was rejected because of the turkeys
being in bad condition, and, with defendant's consent, they were turned
over to the Mentzer Company for sale. They yielded net $4,064.42,
and the proceeds were turned over to plaintiff. After the rejection of
the car, to wit, November 28th, plaintiff drew back on defendant for
the amount which it had paid on their draft, to wit $4,882.39, and de-
fendants paid same. Thereafter, at the instance of Smith, hereto-
fore referred to, plaintiff authorized defendants to redraw on it for
the sum of $4,882.39, which they did on December 4th, and plaintiff
paid the draft on December 7th. Thus it was that plaintiff paid two
drafts against this one shipment each for the sum of $4,882.39, one
of which was paid back by defendants. Defendants' payment can be
treated as a cancellation of plaintiff's first payment, or plaintiff's sec-
ond payment can be treated as a cancellation of defendants' payment.
It was just as it would have been had plaintiff allowed the first pay-
ment to stand, and defendants had not paid it back. But plaintiff
overlooked the fact that it had paid a second time this draft for that
amount made against that shipment. It acted on the idea that its pay-
ment of the draft had been repaid by defendants, and that was the

end of this matter. Thus it was that it claimed that defendants were accountable to it for the sum of $3,975.10 only when, if each of its several subordinate claims were correct, they were accountable to it for $4,882.39 in addition or in all for the sum of $8,677.49.

The defendants did not concede the correctness of any one of plaintiff's subordinate claims. They denied the right of plaintiff to reject either one of the four shipments. They claimed that it was plaintiff's fault that each was in bad condition. The contract provided that "Armour cars (i. e. plaintiff's cars) were to be used as much as possible." Defendants ordered such cars from plaintiff's agent at Cincinnati on November 9th, the next day after the contract was made, but did not get one to make a shipment from Cynthiana until November .17th, eight days after their order, or one to make a shipment from Marshall until November 20th, 11 days thereafter. In the meantime the turkeys were accumulating on their hands, and they had to obtain cars from the Merchants' Despatch Transportation Line, and they could not get them sufficiently to enable them to make proper. shipments. They were compelled to overload the cars. The bad condition was due to this overloading, and the overloading was due to the failure of plaintiff to furnish cars promptly pursuant to their orders. Thus it was that defendant claimed that it was plaintiff's fault that each of the rejected shipments was in bad condition. Possibly it is not without some significance that the shipments rejected were all in cars of the Merchants' Despatch Transportation Line. The shipment in a car of that line on November 17th from Marshall was rejected, when one from Cynthiana on same date in an Armour car was accepted, and a shipment in car of that line on November 20th from Cynthiana was rejected, when one from Marshall on same date in an Armour car was accepted. Defendant claimed, also, that plaintiff was at fault in the sale of the two cars which were turned over to Kimball & Co., to wit, Nos. 9,948 and 12,303, one from Marshall and the other from Cynthiana. It refused to comply with defendant's request to turn them over to Fales & Co. for sale after they had been rejected without reimbursement for the payment of the drafts which defendant had made against the shipments. This they claim it should not have done because at plaintiff's instance they had given it a bond with good security protecting it from loss by reason of the payment of any drafts to meet just such a case. But, as it did not comply therewith, it should have had Kimball & Co., one of its agencies to whom it turned over the turkeys, to put them on the market at once whilst the Thanksgiving trade was on, which they did not do. They withheld them from the market until that trade was over. This they did because the market was overstocked, and it would depress the price on plaintiff's other turkeys to have put them on the market at that time. Defendants denied, also, that plaintiff's claim that the invoice for car No. 8593 was not correct, or that it should have credit for the $258.40 paid upon draft for freight on car No. 12989, or that either of the four items which I have set forth should be deducted or charged against them. It cannot be said that defendants' claims in each one of these particulars was not without merit. Seemingly they did not put as much stress on the position that plaintiff

was responsible for the bad condition of the four shipments referred to in not furnishing cars promptly, as that it caused too great a loss on the two shipments turned over to Kimball & Co., in that for its benefit they were withheld from the market until the Thanksgiving trade was over. The four items which plaintiff claimed to be entitled to deduct from whatever it was accountable for had very little merit. Similar deductions were claimed as against each of the other persons and firms with whom plaintiff had had similar dealings, and in each instance they seem to have been remitted. The main item of $1,577.21 being one cent per pound on 157,721 pounds is hard to account for. Certainly no such deduction should be made on account of the shipments rejected. Defendants were entitled to have plaintiff account for the net proceeds of sale without any deduction. The change in the invoice of car No. 8593, which it claimed the right to make, involved a deduction of 1 cent per pound from the amount of that shipment. These five shipments came to 133,113 pounds, which deducted from the total amount leaves only 96,608 pounds. I cannot see, therefore, where the right to deduct 1 cent per pound on 157,721 pounds came in. Possibly some matter that has escaped me would clear this up.

Such, then, were the respective claims of the parties when the matter of settling their accounts came up between them. They made several attempts to settle them without any result. The first one was at Lexington on January 2, 1906, the next at Cynthiana on January 10th or 11th, the next at Chicago on January 15th, and the last one at Paris on February 16th. On the first and last occasion plaintiff was represented by Hurlburt, who had represented it in making the contract, and an accountant named Patterson. On each of these occasions plaintiff made attempts at settlement, and settled with other members of the association. On the occasion at Cynthiana plaintiff was represented by its accountant Patterson, and no one else. At Chicago various of its representatives took a hand in attempting to bring about a settlement. Smith was on hand on all of these occasions except the one at Cynthiana to help bring about a settlement. Finally a settlement was reached at Lexington on February 27th. The plaintiff was represented in making the settlement by Smith alone. Defendants had notified plaintiff on the 24th that they were going to Lexington on that date to bring suit, and, at plaintiff's request, Smith went there to represent it in effecting a settlement, and during the negotiations that resulted in the settlement Smith had telephonic communication with plaintiff. In all the attempts at settlement and in the final settlement the account between plaintiff and the firm of Renaker & Heinrich was taken into consideration. That firm had made five shipments from Mt. Sterling. The invoices of those shipments amounted to $10,607.61. The drafts made against them amounted to $8,630.93, which deducted from the invoices left a balance of $1,976.68 coming to Renaker & Heinrich. The plaintiff claimed the right to deduct from this balance certain items of a somewhat similar character to the four items in the other account amounting in all to the sum of $535.67, which, if deducted from the above balance, left a balance of $1,440.41 due the firm of Renaker &

Heinrich. The only dispute as to this account was as to the right of plaintiff to deduct those items amounting to $535.67. Putting these two accounts together, if defendants were correct in their full position that they should be settled by balancing the payments made on drafts drawn upon the several shipments against the invoices thereof, there was due from plaintiff the sum of $8,238.78; i. e., $6,262.10 because of the Renaker & Sons account and $1,976.68 because of the Renaker & Heinrich account. If, however, plaintiff was correct in its full position, then there was due to it the sum of $7,236.48; i. e., $8,677.49, the amount due it from defendants, less $1,441.01, due from it to the firm of Renaker & Heinrich. On the idea, however, that defendants had paid the first draft for $4,882.39 against the shipment of November 13th in car No. 12989, and hence were not chargeable therefor, and plaintiff had not paid the second draft for the same amount, the amount due plaintiff from defendants was $4,882.39 less than said sum of $7,236.48; i. e., $2,354.09. At some time during the attempts at settlement, possibly as early as the first attempt at Lexington on January 2d, the plaintiff indicated a willingness to square the accounts on the basis that its claim was for the sum of $2,354.09. It reached this by allowing the defendants $1,881.49 and Renaker & Heinrich $472.60, the two together amounting to $2,354.09. These allowances consisted of the four items for shrinkage, etc., amounting to the sum of $1,818.-62, which plaintiff had claimed it had the right to deduct from what it was accountable for, and $472.60 of the deductions claimed in the Renaker & Heinrich account, and $62.87 to square the account. The Exhibit 100 filed with the deposition of George N. Tate is a relic of this proposition. In making these allowances plaintiff was doing no more than it did with the other members of the association, none of whom had suffered any such severe loss as defendants had. Defendants refused to consider any such proposition. At the beginning they asked at least as much as $7,000 in settlement. They asked this amount of Patterson at Cynthiana on the occasion of his visit there on January 10th and 11th, and before he left they dropped to as low as $4,000 or $3,500. At Chicago they reduced their proposition to $3,000, and then after the meeting at Paris on February 16th, and some time before February 24th, when they notified plaintiff that they were going to Lexington on the 27th to bring suit, they in some way communicated to plaintiff a willingness to accept $1,500 in settlement. Possibly this willingness was communicated at the meeting at Paris on February 16th or earlier. The acceptance of this sum involved the abatement of $6,738.78 from defendants' claim and a loss of that amount on the transaction. The plaintiff, as heretofore stated, after being so notified on the 24th, sent Smith to Lexington on the 27th when and where a settlement was effected by plaintiff agreeing to accept defendants' proposition to pay $1,500 in full settlement of their claim. Thereupon Smith wrote, and defendants signed, a proposition in these words and figures:

"Lexington, Ky., February 27th. 1908.

"Armour & Co. For the sum of Fifteen Hundred Dollars I agree to relinquish Armour & Co., for all claims I have against them at Marshall and

Cynthiana, Ky., and I further agree to settle with Renaker & Heinrich at Mt. Sterling the amount you owe them and when this money is paid it will be settlement in full. S. Renaker & Sons.
"Renaker & Heinrich."

At the same time they signed a receipt in these words and figures:
"Lexington, Ky., February 27th. 1908.

"$1500. Received of Armour & Co., Fifteen Hundred Dollars, it being in full settlement for all turkeys shipped them during the year 1905 from Marshall, Ky., Mt. Sterling and Cynthiana, Ky., and for all damages sustained. I further agree to settle the claim that Mt. Sterling has against Armour & Co. S. Renaker & Sons.
"Renaker & Heinrich."

No money was in fact paid that day. Smith transmitted the two documents to Armour & Co. It caused another paper in these words and figures to be prepared:
"Cynthiana, Ky. Mar. ———, 1906.

"Whereas S. Renaker & Sons, Cynthiana, Ky., and Renaker & Heinrich of Mt. Sterling, Ky., heretofore during the fall of 1905 entered into contracts with Armour & Co. in and whereby they agreed to sell certain turkeys purchased by them to said Armour & Co., under the terms and conditions of said contracts, reference to which is hereby made, and

"Whereas, disputes have arisen between Renaker & Sons and Renaker & Heinrich and Armour & Co., and Kimball & Co., of Boston, Mass. growing out of the purchase, sale and handling of said poultry, and

"Whereas, said matters in dispute have been thoroughly gone over and thoroughly discussed, and the difference between the various parties arrived at.

"Therefore in consideration of the sum of $1500 this day paid to S. Renaker & Sons and Renaker & Heinrich by said Armour & Co., the receipt of which said sum is hereby acknowledged, S. Renaker & Sons and Renaker & Heinrich acting by the various members of said copartnerships, hereby acknowledge complete and full satisfaction of all matters of difference between Armour & Co., and Kimball & Co., themselves and their respective firms growing out of said contracts and each and every shipment and part and parcel of said contracts and release said companies from all claim of liability or damage in any wise growing out of same or connected therewith."

And on March 5th inclosed same and a check for $1,500 in a letter to the National Bank of Cynthiana with directions to deliver the check to defendants upon the execution of the receipt, which was done.

In making this settlement as well as in all attempts at making a settlement, plaintiff acted on the idea that defendants had repaid the draft of $4,882.39 against the shipment in car No. 12989, and hence were not chargeable therefor, and plaintiff had not paid the second draft for the same amount. As to this, I have not the slightest doubt. Thereafter, within a week or 10 days, plaintiff discovered its mistake as to the payment of the second draft of $4,882.39 on December 7th, and that it had settled with the defendants upon the idea that the first payment of that sum had been repaid by defendants, and that it had not again paid the same amount to them.

[1] Such, then, are the facts out of which plaintiff's claim to recover the sum of $4,882.39 and interest has arisen. What it seeks to recover is the amount paid on the second draft against the shipment in car No. 12989, the first shipment made by defendants, and interest on same. It seeks to recover same on the ground that in agreeing to

the settlement and paying the $1,500 in pursuance to it by mistake on its part at least that payment was not taken into consideration. The bill alleges that this item in the account was not taken into consideration in the making of the settlement by the defendants as well as the plaintiff, and that, therefore, its omission was by the mutual mistake of both parties. As just stated, I have a sure conviction that, so far as plaintiff was concerned, this item was not taken into consideration by it in agreeing to the settlement and carrying it out, and that this was because of a mistake on its part. I have this conviction notwithstanding the existence in the record of certain evidence hereafter to be referred to. I am equally sure that there was no mistake on defendant's part in this particular. They had in mind at all times that in a settlement they should be charged twice with the sum of $4,882.39 and plaintiff once with that same sum, or, what amounts to the same thing, that they should be charged therewith once, and plaintiff not at all. They settled with plaintiff on that idea. It is possible, if not likely, that they knew when they settled that plaintiff was acting under this mistake. On December 26, 1905, plaintiff sent to defendants an itemized statement of their account, and also of the account of Renaker & Heinrich. The one showed a balance of $3,795.10 due plaintiff, and the other a balance of $1,441.01 due Renaker & Heinrich, or a net balance of $2,354.09 due plaintiff. In defendants' account they were charged with the payment of the first draft for the $4,882.39, and credited with the same amount as paid back by them, but they were not charged with the second draft therefor. It is just barely possible that defendants did not notice this mistake. They were not asked as to whether they did or not. The showing of the account was so different from what they claimed it should be even with this item included that they may not have scanned it closely and noticed the mistake. There is nothing to indicate that, when they settled they then understood that plaintiff had not discovered the mistake after rendering the account, or were then laboring under it. No account was then or ever stated between them. Yet, notwithstanding this certain mistake on plaintiff's part, I am much persuaded that the plaintiff ought not to recover. This is not because the mistake was not mutual. I do not understand that in such a case as we have here that it is essential that the mistake be mutual. It is because under the circumstances it is not equitable that it should recover. It seems to me that $1,500 is no more than plaintiff should have paid defendants in settlement. The evidence makes clear that the plaintiff was at fault, in that, after it had exacted of defendants an obligation to use its cars as much as possible, it did not promptly furnish them, thereby compelling defendants to overload the M. D. T. cars that they had to procure, and, further, in that Kimball & Co., its agents, did not put the two shipments in cars Nos. 9948 and 12303 at once on the market, if not in not complying with defendants' request to turn them over to Fales & Co., to sell them without demanding repayment of the draft, having a good bond to protect them from loss thereby. It also satisfies me that plaintiff had no right to deduct most, if not all, of the items which it claimed the right to deduct in both accounts from the

amount due defendants. As it is, the defendants have stood more than one-half of the loss on the four shipments in question, and I think that was enough for them to stand. I am quite sure that knowledge on the part of defendants that plaintiff was advised as to the true state of the matter as to which it was mistaken would not have led them to consent to any better settlement than they did. It would be inequitable now to hold them to the settlement, and give back to plaintiff his $4,882.39 and interest.

Then, in addition to this, in making the mistake, the plaintiff was guilty of gross negligence. It is a fundamental principle of equity jurisprudence that equity will assist only the vigilant. In 1 Enc. L. & P., a work which much to the detriment of the profession broke down after the issuance of its fifth volume (page 728), it is said:

"Equity may refuse to relieve against mistakes in an account stated which are the direct result of the gross negligence of the person who makes them."

It cites in support of this statement the case of Cannon v. Sanford, 20 Mo. App. 590, in which it was held that mistakes in the statement of an account will not be corrected where the complainant has been guilty of gross negligence. The way in which I make out that the plaintiff was guilty of gross negligence is this: I do not know that I clearly understand plaintiff's method of bookkeeping. I feel quite sure that it keeps a cash account showing money paid out and money received and a ledger to which the items of the cash account are posted. It seems that whilst a transaction with another is current it keeps together in one place all invoices, bills of lading, telegrams, drafts, and checks paid and memoranda relating to the transaction until it is closed, when they are finally audited. In the transactions with defendants and Renaker & Heinrich this final auditing did not take place until a month after the settlement, to wit on April 4th. Now, it would seem that the account of December 26, 1905, which plaintiff sent to the defendants, and in which the mistake appeared, was made up from this file of papers relating to those transactions, and not from any cash account or ledger. The first draft for $4,882.39 was not amongst those papers. When the shipment in car No. 12989 against which it was drawn was rejected, and plaintiff drew back on defendants for the amount thereof, their draft was attached to the draft on defendants, and taken up by them when they paid its draft. In running over the papers to make up the account the second draft was taken to be the first one and defendants' draft as the repayment thereof, and this notwithstanding plaintiff's draft was dated December 4th and defendants' November 28th. Possibly this would not be sufficient in itself to make out a case of gross negligence on plaintiff's part; but this is not all. After defendants had settled with plaintiff through Smith, they turned over to him all their papers to take home with him to Shelbyville, Ky., for the purpose of settling with others, possibly other members of the association. In running over defendants' papers he came across the account of December 26, 1905, which plaintiff had rendered defendants. He noticed the two items of $4,882.39 on each side of the account canceling one another; and having personal knowledge of the payment of the other draft, payment thereof having been procured by

himself, he felt that plaintiff had made a mistake in making the settlement. In the settlement of the accounts of plaintiff with the various members of the association Smith had acted as a peacemaker; but he did not think it would be right to withhold from plaintiff the knowledge which he had obtained. He at once called it up by telephone and informed it of the fact that it had paid two drafts each for the amount of $4,882.39 drawn against the one shipment, and had charged defendants with only one, when it had credited them with the amount they had repaid. Plaintiff's auditor and possibly its assistant auditor and a clerk in the department looked into the matter. But in their investigation they confined themselves to the file of papers relating to the transactions in question, and made the same blunder as before. Thereupon the auditor called up Smith over the telephone, and haughtily informed him that they did not pay for things twice, and did not do business in that way. His manner was such that Smith felt impelled to beg his pardon for meddling in plaintiff's affairs, and he then dropped the matter. This transpired on March 1st or 2d after the settlement at Lexington on February 27th, and the transmission of defendants' proposition and receipt to plaintiff, but before plaintiff had sent its check for $1,500 to defendants accompanying the stringent receipt which it had its lawyers prepare for defendants' signature on delivery of the check. This happened on March 5th. The plaintiff in settling with defendants and paying them $1,500 under the mistake in question failed to heed the scriptural injunction, "Let him that thinketh he standeth, take heed lest he fall," or to bear in mind one of the business maxims of Swift, another meat magnate, "That the big head and a bank account don't go together."

But in answer to these considerations it may be urged that the fact that defendants were aware that plaintiff in making the settlement was acting under the mistake in question and concealed their knowledge from it should deny them any benefit arising therefrom. Possibly fair dealing on their part required of them to advise plaintiff of the mistake if they were aware of it, though possibly question may be made as to this in view of the fact that plaintiff's course in driving such a hard bargain with defendants was open to criticism. As to this, it is sufficient to say that it has not been made clearly to appear that they were aware of the fact that plaintiff was so acting. It is merely a matter of inference that they were so aware from the fact that the mistake appeared in a statement of account transmitted by plaintiff to defendants two months before the settlement. There is absolutely nothing else tending to make this out. They were not asked anything as to their state of knowledge on the subject. No account was ever stated between them. The $1,500 paid was not the balance due upon any account made out by either party. It was simply the lump amount which the defendants dropped from their demand at the start, $7,000, in settlement of their claims. So it is that, under all the facts and circumstances of the case, I do not think that it would be equitable to make the defendants pay back this sum of money.

[2] But this is not all of this case. There is another feature in it which I would be glad if it were out of it, and to which I would make

no reference if it were not fair to the plaintiff that I should make clear that I have considered it and determined what weight should be attached to it, particularly in view of the fact that I have concluded that it should be denied the relief which it seeks. It is that it looks as if the defendants have been impelled to attempt to bolster up a good case by deliberate falsification. From plaintiff's standpoint it was important for it to make out that it made the settlement acting under the mistake in question. Without this it had no case. What I have in mind is testimony on the part of each of the three defendants, which, if true, shows that plaintiff did not make the settlement under any such mistake. As heretofore stated, the second attempt at settlement occurred on January 10th or 11th at Cynthiana, when plaintiff's accountant, Patterson, was there as its representative. According to defendant's testimony, Patterson was at Cynthiana three days. During that time he went over all their books and papers, and drew up a statement of account between plaintiff and defendants, by which it was shown that plaintiff owed defendant $1,500, the amount at which the settlement was had. In this statement the defendants were charged with $4,882.39 only once, but were not credited with that amount. Of course, this was exactly the same as if defendants had been charged with it twice, and credited with it once. In it the plaintiff was charged with the proceeds of the New York shipment, which had been rejected, and of the Boston shipment, which had been rejected and sold by Mentzer & Co. As to the two rejected shipments sold by Kimball & Co., they were not charged with the proceeds thereof which was at the rate of 4 cents per pound, but with what they would have come to—that in car No. 9948 at 12 cents a pound and that in car No. 12303 at 16 cents a pound. This was done according to the testimony of defendant S. Renaker pursuant to an agreement between him and plaintiff represented by Hurlburt, its poultry department head, at the first attempt at settlement at Lexington on January 2d. The testimony of the three defendants was that the statement so prepared by Patterson was in his handwriting, and that, whilst he was there, the defendant Barry Renaker transcribed it on a typewriter, making a carbon copy, which was taken by Patterson for plaintiff and the original retained by them and produced in evidence. I do not recall whether the original writing by Patterson is accounted for or not. Possibly it is testified that it was destroyed at the time. I understand the effect of the testimony of defendants is that plaintiff then agreed to pay them the amount thus found to be due, to wit, $1,500. It is not so clear that defendants agreed to accept same in full.

Now it looks as if this testimony of defendants as to the preparation of this account is false, and that knowingly so. Of course, if it is true, plaintiff did not make the settlement acting under the mistake in question. The circumstances which lead me to this conclusion as to the appearance of things are these: Hurlburt testifies that he made no such agreement with defendants as to the two shipments sold by Kimball & Co. at Lexington on January 2d, or at any other time. Patterson testifies that he did not go over defendants' books and papers whilst at Cynthiana on January 10th or 11th, and was not there as

much as three days. He went there with plaintiff's papers with a view of settling, but no effort was made at settling because defendants let it be known that they would not settle for less than $3,500 to which they dropped from $7,000, the amount first asked. He did not have much to do with them, and returned home without any stating of the account between plaintiff and them. The testimony of Hurlburt and Patterson, of course, is not sufficient in and of itself to overthrow that of defendants, but this is not all. Defendants testified that the amounts with which plaintiff was charged on account of the two shipments sold by Kimball & Co. in the statement of account then prepared by Patterson had been agreed on by Hurlburt at Lexington on January 2d. The defendants introduced in evidence a copy of a letter written by them to Hurlburt at Chicago on January 4th, in which they say:

"Will you please advise us if a statement rendered by you on December 27th. 1905 is your final decision on the two cars of poultry No. 9948 and 12303. A prompt reply will be appreciated."

The two cars referred to contained the shipments sold by Kimball & Co. This letter hardly permits of an agreement with Hurlburt two days before that the plaintiff was to be charged with these two shipments at 12 and 16 cents per pound, respectively, instead of at 4 cents per pound, the price at which Kimball & Co. sold them and charged in the statement referred to. It is fair to defendants to say that Hurlburt in answer to this letter wrote defendants on January 5th, and said:

"Answering letter of 4th, going to do exactly as agreed. Are anxious to have you satisfied. Please come to Chicago Monday or Tuesday our expense. Will try adjust everything your satisfaction."

This evidences that there had been some agreement. But the agreement may have been solely as to the deduction which plaintiff claimed from the amount with which it was chargeable. And no doubt Exhibit 100 dated January 2d is a relic of that agreement. This circumstance, however, tending, though it does, somewhat against defendants' testimony in the particular stated, is not sufficient in connection with the testimony of Hurlburt and Patterson to overthrow that testimony. But this is not all. According to that testimony, plaintiff had made out that it owed defendants at least $1,500 and agreed to pay it, and they had all but agreed to accept it. Yet we find them coming together after this twice, once in Chicago on January 15th and another time in Paris on February 16th with a view of trying to settle. At Chicago defendants wanted $3,000, and it does not clearly appear that they came down as low as $1,500 until after the meeting at Paris on February 16th. As to plaintiff, apart from the alleged transaction with Patterson at Cynthiana on January 10th or 11th, it does not appear that it at any time indicated a willingness to pay more than $1,000 and Hurlburt in his telegraphic answer to defendants' telegram of February 24th that they were going to bring suit at once, bearing same date, said:

"Replying to your message, unable to get authority to pay $1500 you ask. Hope you see your way clear let me send $1000 which I have authority for."

This does not comport with Patterson having made out at Cynthiana on January 10th or 11th in a statement embodying items in accordance with a previous agreement between defendants and Hurlburt that plaintiff owed defendants $1500 and agreed to pay it. But this is not all.

Amongst the members of the Association of Poultry Dealers was one J. T. Cannon, a grandnephew he tells us of "Uncle Joe," of Boyd, in Harrison county, a neighbor of defendants, and possibly having some interest in their contract. He was in Boston when the shipments from the various members of the association began to arrive just before Thanksgiving. The ubiquitous Smith was there also. The two and another shipper named Connell saw defendants' two shipments in cars Nos. 9948 and 12303 when they arrived and were rejected. They examined the turkeys carefully, and came to the conclusion that those in car No. 9948 were worth 12 cents a pound and those in car No. 12303 were worth 16 cents a pound, and, if they were placed upon the market at that time, they would bring those figures. At some time during the attempts of plaintiff and defendants to settle defendants turned their books and papers over to Cannon, who was somewhat of a scribe, to make up the account as it should be, charging plaintiff on account of the rejected cars other than those sold by Kimball & Co. with what the shipments in them had yielded when sold and on account of those in the cars sold by Kimball & Co. with 12 and 16 cents, respectively. This he did and furnished same to defendants. According to the testimony of Cannon, this he did about the last of January or along in February, long after Patterson had been in Cynthiana on January 10th or 11th. There is no other evidence as to when it was prepared. The statement of account that he drew up made out that defendants owed plaintiff $593.82, which deducted from what plaintiff owed Renaker & Heinrich without deducting any of the disputed items amounting to about $500 left due from plaintiff close to $1,500. In this statement in connection with the item as to shipment in car No. 9948 occur these words: "At twelve cents, very lowest estimate placed on this car by Com't"; and in connection with the item as to the shipment in car No. 12303 occur these words: "Very lowest estimate placed on this car by Com't was sixteen cents per pound net." The committee referred to was himself, Smith, and Connell, and they made these estimates at Boston as stated. This statement defendants subsequently returned to Cannon, and it was placed in evidence in connection with his testimony. Now, the statement of account which defendants testify was prepared by Patterson at Cynthiana on January 10th in so far as it relates to defendants' account with plaintiff is word for word and figure for figure a copy of this statement of Cannon's, prepared the last of January or in February. It contains the statements in regard to the estimates placed on the shipments in cars 9948 and 12303 by the committee, which he could not have obtained from any one except some member thereof, with neither one of whom he ever had any communication in regard thereto. The other part of the statement relating to the account of Renaker & Heinrich seems to have been prepared by one who must have had before him a state-

ment of account prepared by plaintiff in March after the discovery of the mistake and which plaintiff's witnesses testified was mailed to defendants, the receipt of which they deny.

But this is not all. In the statement which defendants testify Patterson prepared at Cynthiana on January 10th or 11th there is credited to defendants the sum of $180.21 for expenses to Chicago, Lexington, and Paris agreed on by Mr. Hurlburt. This is quite heavy for such expenses, and may have been fixed at that amount so as to leave an exact balance of $1,500. But the significance in the item lies in the fact that on January 10th or 11th, when Patterson is said to have prepared the statement at Cynthiana, defendants had not been to Chicago and Paris, and had not incurred any expenses on that account. They did not go to Chicago until January 15th and to Paris until February 16th.

Such, then, are the reasons that lead me to say that it looks like that defendants have resorted here to a deliberate falsification. I will not express myself farther than that it so looks. This I do because defendants' attention has never been called to either one of these circumstances which tells so heavily against the truthfulness of their testimony in this particular. But in disposing of this case I am bound to assume that this testimony is not true, and was knowingly false, and consider what bearing it has upon its disposition. Because of it, should the case be disposed of otherwise than it would have been had it not been in the case? It can affect the disposition of the case only in the event that it affects the circumstances upon which I have been constrained to hold makes it that it would be inequitable for plaintiff to recover in this case. Those circumstances are that defendants got in the settlement no more than they were justly entitled to and the mistake on plaintiff's part, particularly after it had been advised by Smith that it had paid the $4,882.39 twice was because of gross negligence on its part. Of course, this circumstance has no bearing on the matter of plaintiff's negligence. If the position that defendants got no more than they were justly entitled to depended to any extent on their testimony its falsity would affect this circumstance, on the principle of false in one false in all. But to no extent does this circumstance depend on defendants' testimony to any substantial degree. Plaintiff's fault in not furnishing cars is made out by written documents in the case. Its fault in the matter of turning the cars over to Kimball & Co., instead of Fales & Co., as defendants requested, Kimball & Co.'s keeping the turkeys off the market until after the Thanksgiving trade was over and the harm that defendants suffered by their so doing is made out by the testimony not only of Cannon, but of Smith, the friend of all concerned, whom plaintiff trusted to make the settlement on its behalf, and who would not have plaintiff wronged if he could help it. His testimony is that the shipment of turkeys in cars Nos. 9948 and 12303 were slaughtered or almost given away, yielding 4 cents a pound, that they were in better condition than the shipment in No. 11429 sold by Mentzer & Co., which yielded after paying all expenses 14 cents per pound, that the way they were then selling the shipment in car No. 9948 should have brought not

less than 12 cents, and that in car No. 12303 not less than 16 cents, that plaintiff had bought more turkeys than it needed, or that it knew what to do with, and on Thanksgiving morning it had 25 or 30 cars on the track undisposed of, and that it had bought the turkeys at a high price. He was familiar with every matter of dispute between plaintiff and defendants, and he has stated the account as he thinks it should be between plaintiff and defendants, and, according to that statement, the plaintiff still owes after the payment of the $1,500 the sum of $149.23. It follows, therefore, that there is nothing in the falsity of this testimony that should lead to a different disposition of the case from what it otherwise would have been.

If the reality is as the appearance of things, how, then, did it come about that defendants felt impelled to uphold a good case in such a way? It has occurred to me that this was the way of it: The taking of plaintiff's evidence demonstrated beyond question that in making the settlement it acted under the mistake in question. This presented quite a serious aspect to defendants. They felt that they had received no more than they were justly entitled to, and yet felt that they were in danger of having to pay to plaintiff what to them was a very large sum of money. They doubted the court's veracity, by which I mean, not its character in the matter of truthfulness of statement, but in the matter of passion, to see things just as they are and not otherwise, or its ability so to do. This was their situation. The ideal that "man shall not live by bread alone," which so needs to be upheld in these times of so much greed and hate, was not a controlling force with them, and they yielded to temptation.

Let the bill be dismissed at plaintiff's costs.